**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 1 6 2009 ★

**BROOKLYN OFFICE**




ORIGINAL
DEF
CIM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

DIXIE K. NORRIS,

        Plaintiff,

        -against-

NEW YORK CITY COLLEGE OF
TECHNOLOGY, CITY UNIVERSITY OF
NEW YORK and RUSSELL K. HOTZLER,

        Defendants.

----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 07-CV-853

*Appearances:*
*For the Plaintiff:*
LOIS CARTER SCHLISSEl, ESQ.
RICHARD S. CORENTHAL, ESQ.
JONI S. KLETTER, ESQ.
Meyer, Suozzi, English & Klein, P.C.
1350 Broadway, Suite 501
New York, NY 10018

*For the Defendants:*
ANDREW M. CUOMO, ESQ.
Attorney General of the State of New York
By: CHRISTINE A. RYAN, ESQ.
    KAREN DAHLBERG, ESQ.
    Assistant Attorneys General
120 Broadway, 24th Floor
New York, NY 10271

**BLOCK, Senior District Judge:**

        In December 2004, Dixie Norris ("Norris") was terminated from her position as Vice President for Finance and Administration at the New York City College of Technology ("City Tech"). She filed this action against City Tech, its president, Russell K. Hotzler ("Hotzler"), and the City University of New York ("CUNY"), claiming that her termination was based on sex discrimination and retaliation in violation of Title VII, the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

        After a six-day trial, a jury found that Hotzler's decision to terminate Norris

was not based on her sex, but *was* in retaliation for Norris's complaints of sex discrimination. It awarded $75,000 in compensatory damages and $425,000 in punitive damages; the parties agreed that the issues of back pay and front pay would be decided by the Court.

At the close of Norris's case-in-chief, defendants moved for judgment as a matter of law on all claims pursuant to Federal Rule of Civil Procedure 50; the Court denied the motion. *See* Trial Tr. at 517.[1] Defendants now renew their Rule 50 motion with respect to the retaliation claim; in the alternative, they move for a new trial pursuant to Rule 59. In the event the Court upholds the finding of retaliation, defendants seek an order either vacating or remitting the jury's award of punitive damages.

For the following reasons, defendants' motion for judgment as a matter of law, motion for new trial and motion to vacate the award of punitive damages are denied; however, the Court remits the amount of punitive damages to $25,000, subject to Norris's right to demand a new trial limited to that issue. On the issue of Norris's economic damages, the Court denies front pay and invites the parties to address the proper end date

---

[1]Defendants did not renew their Rule 50 motion at the close of all the evidence. In *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008), the Second Circuit noted that such a renewal was a prerequisite to a post-verdict motion for judgment as a matter of law unless "the trial judge has indicated that renewing a previously made motion for judgment as a matter of law was not necessary, and . . . the opposing party could not reasonably have thought that the motion was dropped." *Id.* at 133. *Brady*, however, addressed a prior version of the rule, *see id.* (citing Fed. R. Civ. P. 50 (1995)); the 2006 amendments to Rule 50 – which *Brady* did not mention – "eliminated the requirement that a motion for judgment as a matter of law must be made at the close of all the evidence." 9B Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2536 (3d ed. 2008) (internal quotation marks omitted).

2

for back pay in additional submissions.

## I. Judgment as a Matter of Law

The Court's denial, during trial, of defendant's Rule 50 motion does not preclude setting aside the jury's verdict. *See* Fed. R. Civ. P. 50(b) ("If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."). Nevertheless, a district court may set aside a jury's verdict "only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result or sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) (citations, internal quotation marks and alterations omitted). The court "must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (citations omitted). In other words, a party seeking to overturn a verdict bears the heavy burden of convincing the court that "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir. 1993) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970)).

Defendants contend that a reasonable jury could only have concluded that

3

Norris's termination was not motivated by retaliatory animus. They argue that this is so for two reasons.

## A. The Timing of Norris's Termination

First, defendants posit that the evidence adduced at trial conclusively established that Hotzler terminated Norris on December 17, 2004, three days *before* he learned of Norris's written complaint of sex discrimination. It is, of course, true that to prevail on a retaliation claim, the plaintiff must prove, *inter alia,* that "a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000). "The lack of knowledge on the part of particular [decisionmakers] is admissible as some evidence of a lack of a causal connection." *Id.* at 116.

Drawing on *Gordon,* district courts in this circuit have consistently held that an inference that an adverse employment action was motivated by retaliatory animus must be supported by evidence that the decisionmaker was aware of the plaintiff's protected activity. *See Murray v. Visiting Nurse Servs.,* 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007) (collecting cases); *see also Pinero v. Long Island State Veterans Home,* 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity."). "A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities . . . so long as the jury finds that the circumstances evidence knowledge of the protected activities." *Gordon,* 232 F.3d at 117.

In support of their contention that Hotzler lacked knowledge of Norris's

4

complaint of sex discrimination, defendants cite the testimony of Hotzler and Michelle Harris ("Harris"), City Tech's Human Resources Director. Hotzler testified that he wrote a termination letter on the morning of December 17, 2004; the letter, dated the same day, read as follows:

> As a result of your non-responsive behavior I am writing to confirm your termination as Vice President for Finance and Administration at New York City College of Technology effective close of business Friday, December 17, 2004.

Pl's. Ex. 30. Hotzler further testified that he personally delivered the letter to Norris in her office in the early afternoon of December 17th. *See* Trial Tr. at 639. Both Hotzler and Harris testified that Hotzler informed Harris of his decision later the same day. *See id.* at 563-64, 643-44.

There is no question but that the jury could have found for the defendants had it credited the testimony of Hotzler and Harris. Based on the verdict, however, the Court must assume that it did *not* credit that testimony. *See Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) ("While we review the entire record, we cannot consider evidence favorable to [the party seeking judgment as a matter of law] that the jury need not have believed."). Instead, the jury evidently reached the conclusion that Hotzler did not terminate Norris until December 20th, after he learned of her discrimination complaint. Such a conclusion is amply supported by the evidence: Norris testified that Hotzler did not tell her she was terminated when they met on December 17th, but rather that he had asked her to resign. In addition, she testified that she received Hotzler's termination letter by certified mail in January, when she returned home from a trip to Massachusetts; she

5

specifically denied receiving the letter during the December 17th meeting with Hotzler.

Other circumstantial evidence corroborated Norris's testimony. The letter, though dated December 17, 2004, was not postmarked until December 20th. When, after the December 17th meeting, Norris emailed Hotzler that she felt unwell and would be leaving early for the day, he did not respond that she had been terminated. Nor did he request her keys or other City Tech property before she left. Finally, City Tech's Computer Systems Manager testified that she could not find the termination letter on either Hotzler's or his secretary's computer.

In sum, the parties presented two sharply contrasting versions of the timing of Norris's termination *vis-à-vis* her discrimination complaint: Defendants argued that Hotzler terminated Norris on December 17th, prompting Norris to draft the discrimination complaint in an effort to concoct a retaliation claim. Norris, by contrast, argued that her complaint prompted Hotzler to terminate her on December 20th and then draft a back-dated termination letter to protect himself from such a claim. As demonstrated by its requests for read-backs, *see* Trial Tr. at 839-40 ("THE COURT: I have your most recent note asking for the testimony of Hotzler as well as [Harris] about the December 17th circumstances."), the jury undoubtedly considered the parties' respective positions on the timing issue. Its decision to credit Norris's version of events was reasonable and supported by the evidence; it must, therefore, be upheld.

## B. Hotzler's Prior Dissatisfaction with Norris's Performance

Defendant's second argument also concerns the timing of Norris's termination, but in a broader sense. They contend that even assuming that Hotzler made

6

his decision on December 20th, it was merely the culmination of a longstanding dissatisfaction with Norris's performance. This argument is supported by the evidence, much of it undisputed. Shortly after his arrival at City Tech in August 2004, Hotzler reassigned key portions of Norris's duties. The reassignments, coupled with difficulties meeting with Hotzler, led Norris to complain to Harris several times in September and October; Harris testified that "one of the many things" that Norris mentioned was that "Hotzler may not [have been] treating her fairly because of her sex, because she was a woman." Trial Tr. at. 573. Norris admitted that she was concerned about her job by November and, further, that Hotzler had asked her for an "exit strategy" – which she understood to be a request for her resignation – on December 14th and again during the December 17th meeting.

Norris argues that because her oral complaints to Harris raised the possibility of sex discrimination, they themselves constituted protected activities that motivated Hotzler's hostility. This argument, however, is unpersuasive. "[Employers'] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001); *see also Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir. 1997) (no inference of retaliation where plaintiff admitted that "the reason he called the civil rights offices was precisely because [the defendant] had just told him that he would be fired."). Even assuming –

7

despite her testimony to the contrary – that Harris informed Hotzler of Norris's oral complaints, Hotzler's dissatisfaction with Norris predated any protected activity; therefore, there can be no inference of retaliatory motive from his continuing to act based on that dissatisfaction.

Nevertheless, it is possible to reconcile the evidence with the jury's verdict. As Norris points out, an "exit strategy" is not the same as termination. *Cf. McLee*, 109 F.3d at 136 (employer "in the process of doing all the paperwork to throw [employee] out in the street"). The jury could have reasonably concluded – and the Court must assume that it did conclude – that Hotzler, though dissatisfied with Norris's performance, initially decided to allow her to voluntarily resign at some reasonable date in the near future. Indeed, Hotzler testified that when he first asked Norris to resign, he "offered her a number of possibilities," including "the opportunity to stay at the college for the remainder of the academic year." Trial Tr. at 636. Although Hotzler also testified that he decided to terminate Norris on December 17th because she was not responsive to his requests for a firm departure date, *see id.* at 638 ("I gave her a deadline of getting back to me by Friday, the 17th."), the jury was entitled to reject this testimony and conclude that his change in strategy was triggered by Norris's complaint of sex discrimination.

## II. Motion for New Trial

"As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (citation, internal quotation marks and alteration omitted). "Unlike

8

judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *Id.* at 134. "Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Id.* Nevertheless, "a jury's verdict should rarely be disturbed." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) (internal quotation marks and alteration omitted).

Defendants offer two reasons why a new trial should be granted. First, they argue that the verdict is against the weight of the evidence. As explained above, however, the evidence could reasonably support a verdict for either party; that the jury drew an inference of retaliatory motive from the evidence does not make its verdict seriously erroneous or a miscarriage of justice. *Cf. Piesco v. Koch*, 12 F.3d 332, 345 (2d Cir. 1993) ("[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." (citation and internal quotation marks omitted)).

Second, defendants argue that "[t]he portion of the trial concerning the retaliation claim was fundamentally unfair because the Court effectively ended Plaintiff's cross-examination concerning that claim after Defendants' counsel asked only two preliminary questions." Defs.' Mem. of Law at 18-19. Defendants contend that if they had been permitted more time for cross-examination, they would have confronted Norris with (1) a "prior admission that President Hotzler directed her to prepare an exit strategy," (2) a "document in which she admitted that President Hotzler specifically asked her for her departure date before she complained of discrimination," and (3) a "conversation with a

former colleague, Lenore Gall, about President Hotzler's request for [her] resignation." *Id.* at 21-22.

As an initial matter, it is incorrect that the Court precluded defendants from cross-examining Norris regarding her retaliation claim. A district court has broad discretion "to manage trials so that evidence is effectively presented." *United States v. Quattrone*, 441 F.3d 153, 183 (2d Cir. 2006) (citing Fed. R. Evid. 611(a)). After extensive cross-examination regarding Norris's sex discrimination claim, the Court allowed redirect on that claim. The Court then allowed defendants' counsel an opportunity to ask further questions; that questioning focused almost exclusively on the retaliation claim. *See* Trial Tr. at 301-02 ("THE COURT: Ms. Ryan, do you want to ask any more questions? MS. RYAN: "Yes. I want to ask questions about plaintiff's retaliation claims."). Although this round of questioning technically followed redirect examination, the Court did not impose any restrictions on its scope. *See id.* at 306 ("MS. SCHLISSEL: Your Honor, this is way beyond the scope. THE COURT: Go ahead.").

Moreover, the admissions that the defendants now claim they wished to elicit would have been cumulative; as noted, Norris candidly testified that Hotzler had twice asked her for an exit strategy prior to her termination, and that she understood the import of those requests. The Court is not persuaded that the verdict was seriously erroneous or a miscarriage of justice simply because the jury did not hear those admissions repeated.

### III. Punitive Damages

The parties agree that neither City Tech nor Hotzler can be held liable for punitive damages under Title VII. *See* 42 U.S.C. § 1981a(b)(1) (authorizing punitive

damages under Title VII, except against "a government, government agency or political subdivision"); *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("[U]nder Title VII individual supervisors are not subject to liability."). Punitive damages are not available at all under the NYSHRL. *See Thoreson v. Penthouse Int'l, Ltd.*, 80 N.Y.2d 490, 494 (1992) ("Based on our analysis of the statutory language and the relevant legislative history, we conclude that such damages are not recoverable.").

The NYCHRL authorizes punitive damages. *See* N.Y.C. Admin. Code § 8-502(a). As with Title VII, such damages "are not recoverable against a public corporation such as CUNY," *Bicjan v. Hunter Coll.*, 457 N.Y.S.2d 337, 388 (N.Y. Ct. Cl. 1982); *cf. Katt v. City of New York*, 151 F. Supp. 2d 313, 345 (S.D.N.Y. 2001) (holding that NYCHRL did not waive City's common-law immunity from punitive damages); however, unlike its federal counterpart, the NYCHRL sanctions punitive damages ' against individuals who aided and abetted an employer's acts of retaliation," *Ettinger v. SUNY*, 1998 WL 91089, at *9 (S.D.N.Y. Mar. 2, 1998), and defendants acknowledge that Hotzler – the individual directly responsible for Norris's termination – is theoretically liable for punitive damages under the NYCHRL. They argue, however, (1) that Norris failed to satisfy the standard for an award of punitive damages, and (2) that the award was excessive.

## A. Standard for Punitive Damages

In *Kolstad v. American Dental Ass'n*, 537 U.S. 526 (1999), the Supreme Court held that punitive damages under Title VII "are limited . . . to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Id.* at 529-30

(quoting 42 U.S.C. § 1981a(b)(1)). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 536. "While egregious misconduct is evidence of the requisite mental state, [§ 1981a] does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind." *Id.* at 535.

The standard for punitive damages under the NYCHRL is identical to the standard enunciated in *Kolstad. See Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 102 (2d Cir. 2001) ("[T]he imposition of punitive damages under both federal and local law is governed by the federal standard."). Thus, the NYCHRL, like Title VII, requires "that a defendant not only intentionally discriminate but do so in the face of a perceived risk that these actions are prohibited by law." *Greenbaum v. Handelsbanken,* 67 F. Supp. 2d 228, 262 (S.D.N.Y. 1999).

Defendants argue that Hotzler could not have known that his actions would violate the NYCHRL because he was not aware that Norris had engaged in protected activity when he terminated her. This argument, however, proceeds from a false premise: as explained in connection with defendants' Rule 50 motion, the jury reasonably concluded that Hotzler did not terminate Norris until immediately after he learned of her complaint of sex discrimination. As for knowledge of Norris's rights, the Court has previously explained that such knowledge can reasonably be inferred from "the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory schemes proscribing such conduct, the size of [the defendant], and the common knowledge in today's society that employment discrimination is impermissible." *Hill v. Airborne*

12

*Freight Corp.*, 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002). This holds true for Hotzler, a sophisticated and experienced college administrator who squarely testified that he knew that discrimination and retaliation in employment were against the law. *See* Trial Tr. at 650-51. In sum, the evidence amply supports the jury's decision to award punitive damages.

## B. Amount

In respect to their challenge to the amount of punitive damages, defendants do not argue that the award is excessive as a matter of federal constitutional law, as expounded in cases such as *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), and *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). However, "even where the punitive award is not beyond the outer constitutional limit," it may nevertheless be deemed excessive as a matter of non-constitutional law if it is "so high as to shock the judicial conscience and constitute a denial of justice." *Mathie v. Fries*, 121 F.3d 808, 817 (2d Cir. 1997) (quoting *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978)).

In reviewing an award for excessiveness, a court must "bear in mind that the purpose of punitive awards is to punish the wrongdoer and to deter others." *Id.* The Second Circuit has admonished that "[t]he Supreme Court's guideposts in *Gore*, though marking outer constitutional limits, counsel restraint with respect to the size of punitive awards even as to the nonconstitutional standard of excessiveness." *Id.* Those guideposts are "(1) the degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the

civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (citing *Gore*, 517 U.S. at 575).[2] The circuit court has further held that the excessiveness inquiry for punitive damages, like that for compensatory damages, "requires comparison with awards approved in similar cases." *Mathie*, 121 F.3d at 817; *see also id.* at 813 ("As we have noted, the determination of whether a [compensatory] damages award exceeds a reasonable range should not be made in a vacuum, but should include consideration of the amounts awarded in other, comparable cases." (citation and internal quotation marks omitted)). As the Court noted in *Hill*, however, "comparing punitive damage awards in other cases where employers were found liable for discrimination and/or retaliation is of limited utility because a wide range of awards have been upheld." 212 F. Supp. 2d at 76-77 (collecting cases upholding awards ranging from $10,000 to $1.25 million); *see also Ettinger*, 1998 WL 91089, at *13 (remitting punitive damages to $2,000 per defendant).

The ratio of punitive damages to compensatory damages – 5.67:1 – does not particularly "shock the judicial conscience." *Cf. State Farm*, 538 U.S. at 425 ("[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

The Court notes, however, that the civil penalty for violating the NYCHRL

---

[2]A defendant's net worth can also be relevant to the excessiveness inquiry. *See Lee*, 101 F.2d at 813 ("We recognize that one purpose of punitive damages is deterrence, and that deterrence is directly related to what people can afford to pay."). It is, however, "the defendant's burden to show that his financial circumstances warrant a limitation of the award." *Id.* (citation and internal quotation marks omitted). Defendants offered no evidence of Hotzler's personal financial resources.

– a maximum of $250,000 for a "pattern or practice" resulting in employment discrimination, N.Y.C. Admin. Code § 8-404 – counsels in favor of reduction.[3] Moreover, the Supreme Court has stated that "perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct," *Gore*, 517 U.S. at 575; in other words, "some wrongs are more blameworthy than others." *Id.* Factors bearing on the degree of reprehensibility include "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee*, 101 F.3d at 809 (citing *Gore*, 517 U.S. at 575-77).

While the evidence supports the conclusion that Hotzler acted intentionally and with knowledge that his conduct would violate Norris's rights, no other indicia of reprehensibility are present. There was no violence or threat of violence. Nor was there any evidence of repeated misconduct; indeed, the jury rejected Norris's argument that the longstanding difficulties in her relationship with Hotzler were based on her sex. Even taking the evidence in the light most favorable to Norris, the Court is left with the firm conviction that Hotzler's decision to terminate her after learning of her complaint of discrimination was a transient outburst of pique and frustration; while such conduct warrants some amount of punishment and deterrence, it is not sufficiently reprehensible

---

[3]Civil penalties are recoverable when New York City – as opposed to a private citizen – brings suit to remedy violations of the NYCHRL, *see* N.Y.C. Admin. Code § 8-402(a) (authorizing such suits); akin to fines, they are paid "into the general fund of the city." *Id.* § 8-404.

to support the jury's award of $425,000. *Cf. Mathie*, 121 F.3d at 817 (reducing to $200,000 award of punitive damages for repeated sexual abuse by prison official); *Lee*, 101 F.3d at 812-13 (holding that $200,000 award of punitive damages for malicious prosecution was excessive compared to awards for "the numerous and severe physical and psychological harms" suffered by the plaintiffs in police and prison assault cases).

In the face of an excessive award of punitive damages, a district court may remit the excess, but must offer the plaintiff the option of a new trial in lieu of accepting the reduced amount. *See Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995) ("It is not among the powers of the trial court, where the jury has awarded excessive damages, simply to reduce the damages without offering the prevailing party the option of a new trial."). The Second Circuit has held that "district courts should use the least intrusive standard for calculating a remittitur." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990). "According to that standard, a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Id.*

Notwithstanding the imprecision inherent in its task, the Court must settle on a number that adequately vindicates the goals of punishment and deterrence without being excessive. The Court concludes that, on the facts of this case – in particular, the lack of any violent or repeated misconduct – $25,000 is the maximum amount a reasonable jury could have awarded in punitive damages.[4]

---

[4]Citing the Supreme Court's recent decision in *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605 (2008), defendants argue that the amount of punitive damages cannot exceed the amount of compensatory damages – $75,000. *Exxon* holds that a 1:1 ratio of punitive to compensatory damages is the "fair upper limit" for punitive damages under federal

## IV. Economic Damages

Title VII gives courts "broad discretion, in the exercise of their equitable powers, to fashion the most complete relief possible for victims of discrimination." *Gibson v. American Broad. Co.*, 892 F.2d 1128, 1133 (2d Cir. 1989). The Second Circuit has instructed district courts to use this discretion "to fashion remedies designed to insure that victims of . . . discrimination are made whole." *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984). A plaintiff can typically be made whole "through an award of back pay coupled with an order of reinstatement." *Id.* "In cases in which reinstatement is not viable . . . , courts have ordered front pay as a substitute for reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). The distinction between back pay and front pay is merely one of timing: Back pay is intended to compensate the plaintiff for lost earnings "from the date of her termination until the date of judgment," *Saulpaugh v. Monroe Comm. Hosp.*, 4 F.3d 134, 144 (2d Cir. 1994), while front pay is "simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard*, 532 U.S. at 846.

Pursuant to the parties' agreement to have the Court decide back pay and front pay, they have submitted calculations of Norris's economic damages. With respect to back pay, those calculations are as follows:

---

maritime law. *Id.* at 2633. In light of the Court's conclusion that $25,000 is the maximum acceptable amount of punitive damages in this case, it need not address whether and to what extent *Exxon* bears upon punitive damage awards in other contexts.

| | | |
|---|---|---|
| Lost Wages | $198,039 | $186,917 |
| Lost Pension Contributions | $9,296 | $9,296[5] |
| Increased Health Insurance Contributions | $12,045 | $0 |
| Prejudgment Interest | $52,694 | $18,478 |
| **TOTAL** | $272,074 | $214,691 |

Though differing in amount, the parties' calculations both assume a back pay period of December 2004 to June 3, 2008 (the date of the jury's verdict).

Because Norris has been employed as the Vice President for Administration and Finance at Cape Cod Community College since October 19, 2005, she does not seek reinstatement to her prior position at City Tech. Instead, she seeks a front pay award representing the difference in wages, pension contributions and health insurance contributions between her current and former positions for the period between the jury's verdict and her expected retirement at age 75; reduced to present value, these differentials total $658,550. Defendants argue that no front pay should be awarded because Norris's current position is roughly comparable to her former position in terms of duties and remuneration; they also contend that Norris's proposed time period for front pay is unduly speculative.

The Court's resolution of defendants' Rule 50 motion has raised an issue not

---

[5]Defendants argue that they should be ordered to pay lost pension contributions to City Tech's pension fund rather than to Norris personally; however, they apparently do not dispute the amount of those contributions.

addressed by either party. In *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), the Supreme Court considered the propriety of front pay and back pay (as well as the remedy of reinstatement) where an employer sued for unlawful termination discovers lawful grounds for termination during the course of the suit. Recognizing "the duality between the legitimate interests of the employer and the important claims of the employee who invokes the national employment policy mandated by the [federal antidiscrimination laws]," *id.* at 361, the Court concluded that "neither reinstatement nor front pay is an appropriate remedy" for an employee who, though terminated unlawfully, is later discovered to have engaged in conduct justifying termination. *Id.* at 362. As the Court noted, "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *Id.* While the Court declined to impose an absolute rule forbidding back pay in such circumstances, it held that "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *Id.*

Insofar as *McKennon* concerned grounds for termination discovered during the employee's lawsuit, it is not strictly controlling here. Nor is the jurisprudence surrounding "mixed motive" cases, in which the employer may avoid liability if he proves, by a preponderance of the evidence, "that it would have reached the same decision . . . even in the absence of protected conduct." *Mt. Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). Defendants did not seek a "mixed motive" instruction and raised no objection to the Court's instruction that, on her retaliation claim, Norris was required to prove only

"that President Hotzler's decision to terminate her was made *at least in substantial part* because she had previously complained about sex discrimination and he knew about the complaint." Trial Tr. at 809-10 (emphasis added).

Although they are not precisely on point, the Court draws from *McKennon* and the "mixed motive" case law the commonsense conclusion – confirmed by the guiding principle that both back pay and front pay are intended to "make injured parties whole by placing them in the position they would have occupied 'but for' the discrimination," *Saulpaugh*, 4 F.3d at 145 (citing *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988)) – that lost wages from a termination motivated by retaliatory animus cease to flow if the employer establishes that the employee would have been terminated for lawful reasons at some later date. Since the jury was asked only to decide whether Norris's discrimination complaint motivated Hotzler's decision to terminate her in December 2004, it now falls to the Court – as part of the task of calculating Norris's economic damages – to determine whether and when her employment would have ended in any event.

As explained above, the jury's determination that Hotzlers' decision to terminate Norris in December 2004 was motivated, in substantial part, by retaliatory animus was supported by the evidence; however, in light of the undisputed testimony that Hotzler had reassigned Norris's job duties and asked for her "exit strategy" prior to December 17th, the only reasonable view of the evidence is that even before Norris complained of discrimination, her continued employment at City Tech was not a long-term proposition. This impacts Norris's claims for both back pay and front pay.

With respect to front pay, any "exit strategy" acceptable to Hotzler would

have been a matter of months, not years; there is simply no view of the evidence that despite his dissatisfaction, he would have allowed Norris to remain at City Tech for almost four additional years. In other words, Norris's employment at City Tech would have lawfully ended long before the date of the jury's verdict; therefore, the Court will not award front pay.

With respect to back pay, the Court's determination of the date by which Norris's employment would have lawfully ended must be more specific; however, the specifics of an acceptable "exit strategy" were not explored at trial. Hotzler's testimony that he was prepared to allow Norris to stay through the end of the academic year is some evidence of Norris's eventual departure date, but it is hardly conclusive: That proposal was offered as only one of "a number of possibilities," Trial Tr. at 536, and Hotzler did not elaborate on any of the other possibilities. In any event, there was no evidence regarding the specific date on which the 2004-05 academic year ended.

Since the parties did not have to focus on the issue during trial, the Court will afford them the opportunity to submit letter briefs setting forth their respective positions on the issue of when Norris's employment at City Tech would have ended but for her discrimination complaint. The letter briefs may rely on evidence adduced at trial (with appropriate citations to the trial transcript), as well as any additional evidence bearing on the issue. Upon review of the parties' submissions, the Court will determine whether there is any dispute in the material facts such that an evidentiary hearing is necessary.

## V. Conclusion

Defendants' motion for judgment as a matter of law, motion for new trial and motion to vacate the award of punitive damages are denied. The award of punitive damages is remitted to $25,000, subject to Norris's right to demand a new trial limited to the amount of punitive damages; Norris shall inform the Court of her election within 10 days of entry of this Memorandum and Order. The parties shall, within 20 days, submit letter briefs and any additional evidence addressing the issue of when Norris's employment at City Tech would have ended but for her discrimination complaint.

**SO ORDERED.**

s/FB

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 14, 2009